# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  51068-5-II |
| Respondent, | |
| v. | |
| JOHN FRANCIS JUDE SUPPAH, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — John Suppah appeals his convictions for second degree felony murder, drive-by shooting, second degree unlawful possession of a firearm, unlawful possession of a stolen vehicle, and two counts of witness tampering.  Suppah argues that the trial court erred by (1) denying his CrR 8.3 motion to dismiss and (2) denying his motion to suppress because the court's trap and trace order failed to meet statutory requirements.  Suppah also submits a statement of additional grounds (SAG) raising numerous issues.

We hold that the trial court did not err in denying Suppah's CrR 8.3 motion to dismiss.  We also hold that the trial court did not err in denying Suppah's motion to suppress.  Furthermore, we hold that Suppah's SAG claims lack merit, were raised for the first time on appeal and we do not address them, or are not supported by the record.  Accordingly, we affirm Suppah's convictions.[1]

---

[1] We stayed this appeal pending remand to the superior court for an evidentiary hearing on the issue of Suppah's standing to challenge the trap and trace order.  Suppah moved to lift the stay, which we grant.

No. 51068-5-II

FACTS

A.    THE INCIDENT

On the night of December 18 through 19, 2015, John Suppah, Nadine Lezard, and Thomas Watts left a hotel in a stolen silver Honda Accord. Suppah, who was driving, had been using Lezard's cell phone to text Preston Stafford on Facebook Messenger about meeting in Tacoma. Once in Tacoma, they pulled over to the side of the street. Stafford approached the car, opened the door, and leaned inside the car. Suppah raised his gun and shot Stafford because Stafford allegedly owed Suppah money. Suppah, Lezard, and Watts drove away. Stafford later died from his gunshot wound.

The officers from the Tacoma Police Department who responded to the shooting accessed Stafford's cell phone and found messages from "Nadine." Officer Randy Frisbie identified "Nadine" as Nadine Lezard and determined that she was associated with a Sprint cell phone number ending in 9441.

Detective Gregory Rock of the Tacoma Police Department was the lead detective investigating Stafford's murder. On December 21, 2015, another Tacoma Police detective, James Buchanan, obtained a "trap and trace" order pursuant to RCW 9.73.260[2] for the number ending in 9441. The detectives served the order on Sprint.

---

[2] A "trap and trace" order authorizes the installation of a trap and trace device, which is a device that captures the incoming electronic or other impulses that identify the originating number of the device from which a wire or electronic communication is transmitted. RCW 9.73.260(1)(e), (3).

2

Sprint advised the detectives that the number had been cancelled within the prior 24 hours but that Lezard had a new number with Sprint that ended in 9468. On the same day, Detective Buchanan obtained a trap and trace order for the 9468 number.

The detectives also spoke with Lezard's daughter, who told them that she had received a call from her mother from a Verizon phone number ending in 5627. The detectives discovered that the Verizon number had been used by Suppah in September of 2015. Detective Rock and Detective Ryan Larsen confirmed that Suppah was Lezard's associate and boyfriend and that Suppah had outstanding warrants for his arrest. Detective Buchanan then obtained a trap and trace order for the Verizon number.

None of the trap and trace orders included geographic limits for the orders as required by RCW 9.73.260(4)(c)(i).[3] The trap and trace orders were filed in the court under seal.

On the afternoon of December 21, 2015, Sprint notified Detective Buchanan pursuant to the trap and trace order that the cell phone was in Auburn. The location information included a wide radius, but one of the structures within the radius was a casino. Based on Sprint's information, Detective Rock, Detective Larsen, Detective Buchanan, Detective Stuart Hoisington, and Sergeant John Durocher decided to go to the casino.

Once the detectives arrived at the casino, they found Lezard and noticed Suppah nearby. The detectives arrested both Lezard and Suppah. Suppah was arrested pursuant to his outstanding warrants. When he was searched incident to arrest, Detective Larsen found two cell phones and a key fob. Suppah stated that one of the cell phones, the blue Nokia cell phone, belonged to Lezard.

---

[3] RCW 9.73.260(4)(c)(i) provides, "The order shall specify . . . the geographic limits of the trap and trace order."

After her arrest, Lezard gave a statement to the police that identified Suppah as the person who shot and killed Stafford. She also stated that the car that was used to commit the shooting was the car driven to the casino and that Suppah had the keys.

After Suppah's arrest and Lezard's statements to police, Detective Rock obtained the following search warrants: a search warrant for account and subscriber information, all short message service information, and any connectivity data for Sprint number ending in 9441 from December 18, 2015 to December 21, 2015; a search warrant to search a silver Honda Accord; a search warrant for account and subscriber information, all short message service information, and any connectivity data for Verizon number ending in 5627; and a warrant to search a "black Samsung Smartphone taken off of Suppah's person at the time of arrest" and "a blue Nokia Smartphone taken off of Suppah's person at the time of arrest." Clerk's Papers (CP) at 237, 238.

B.    DISCOVERY/PROCEDURAL MATTERS

On December 22, 2015, the State charged Suppah with one count of first degree murder while armed with a firearm, one count of drive-by shooting, and one count of second degree unlawful possession of a firearm. On December 29, Suppah's first counsel served a demand for discovery on the State. Among the information sought, Suppah's first counsel requested that the State produce:

> 3.    A copy of all applications, affidavits, declarations and statements in support of search warrants issued in this case.
>
> 4.    A copy of all executed and unexecuted search warrants issued in the investigation of the above referenced case.

CP at 14.

4

Suppah moved to have his first counsel removed. The trial court granted Suppah's motion on October 24, 2016, and ordered that new counsel be appointed to represent Suppah. Suppah's second counsel (trial counsel) filed a notice of appearance and demand for discovery on October 26.

Suppah's trial counsel received the defense file from Suppah's first counsel shortly after appearing on behalf of Suppah. There was no trap and trace warrant in the file.

On April 5, 2017, Suppah's trial counsel made a request to inspect the blue Nokia cell phone and Stafford's cell phone. The parties were not able to reach agreement on the inspection of the cell phones, so Suppah's trial counsel filed a motion to inspect. The State objected to the inspection of the cell phones, but did not file a written response to Suppah's motion, even after the trial court ordered the State to respond. The court eventually ordered that Suppah be allowed to inspect the cell phones.

On April 6, Detective Larsen confirmed during a defense interview that a "ping"[4] was involved in apprehending Suppah. Detective Larsen did not have any details about any trap and trace order, but he stated that other detectives had more information.

On April 14, the trial court entered an order unsealing the trap and trace documents pursuant to the State's motion. The unsealed documents included the trap and trace orders which authorized the use of a trap and trace on phone numbers ending in 9441, 9468, and 5627. These discovery materials consisted of 88 pages and were provided to Suppah's trial counsel on April 28.

---

[4] A "ping" generally refers to a trap and trace result.

5

On May 9, the State gave Suppah notice of its intent to file an amended information. On August 15, the State filed an amended information adding charges for second degree felony murder with the aggravating factors of being armed with a firearm, committing the offense shortly after being released from incarceration, and committing multiple current offenses with a high offender score resulting in some current offenses going unpunished; unlawful possession of a stolen vehicle; and two counts of tampering with a witness.

The witness tampering charges arose from evidence obtained from a search of Suppah's jail cell pursuant to warrant issued on June 14, 2016. Detective Rock had obtained the search warrant for

1.      Any handwritten or signed items believed to be written by John-Francis J Suppah, DOB 07/22/1981, to include but not limited to letters, notes, journals and documents.

2.      Any copies of letters believed to be written by John-Francis J Suppah DOB 07/22/1981.

CP at 222.

The search warrant for Suppah's jail cell was based on an affidavit stating that the State had asked the detectives to "contact the jail and see if Suppah is known to write letters or keep journals in his cell." CP at 227. The affidavit also stated that detectives made a phone call to the sergeant in the jail cell and informed her "that detectives were looking to write a search warrant for John Suppah's cell and that they were wondering if anyone would know if he writes letters or keeps a journal." CP at 227. The affidavit further stated that the sergeant in the jail informed the detectives that they had searched Suppah's cell and made a copy of a letter found inside. And the affidavit stated that "[i]t should be noted that at no time did detectives ask any Pierce County Jail

personnel to search Suppah's belongings. The contact to the jail was only done to obtain probable cause to include in the warrant that Suppah was known by jail staff to write letters or keep a journal from staff observing these actions." CP at 227-28. The search warrant was issued, and the officers found known samples of Suppah's handwriting when they executed the search warrant.

C.      CrR 8.3 MOTION TO DISMISS

        1.      Suppah's Motion to Dismiss

On May 16, 2017, the day before the scheduled trial date, Suppah moved for an order of dismissal and alternatively for an order continuing trial. Suppah argued that the State's delay in disclosing the information relating to the trap and trace orders, which were used in the arrest of Suppah and Lezard, "put the defense in a Hobson's Choice of either going to trial unprepared, or requesting a continuance." CP at 8. Suppah also argued that the State interfered with his ability to inspect the cell phones by not responding to his motion to inspect and that the lack of response was prejudicial.

        2.      Hearings Regarding the CrR 8.3 Motion to Dismiss

Suppah argued that the trial court should consider the motion to dismiss before the motion to continue the trial because the State had put Suppah in a Hobson's choice between the need for a continuance and being prepared for trial. But the trial judge had been handed Suppah's motion to dismiss as the judge came onto the bench, so the judge had not read the motion. Trial was scheduled for the next day. The trial court entered an order continuing the trial date to August 15, 2017. The reasons given in the order were pending discovery, potential interviews, and motions to dismiss and suppress.

7

During arguments on the motion to dismiss, the State asserted, "I can tell you the detectives will testify under oath. My lead detective will testify he had no idea that there were [trap and trace] warrants until [Suppah's trial counsel] started looking at them, because they were sealed and they were obtained by someone on a federal task force." Verbatim Report of Proceedings (VRP) (May 16, 2017) at 31. The State argued that the detectives did not have the trap and trace orders. The State further stated that Detective Rock said that he did not even know they existed. But the State also said that the trap and trace warrants were based on the information that Detective Rock gave Detective Buchanan. Detective Buchanan, who wrote the affidavits for the orders, told the State that he did not have the warrants because they were filed under seal. The State further noted that Suppah did not request copies of the court orders for the trap and trace until early to mid-April. The State eventually located the warrants at the superior court clerk's office under seal. The State gave the warrants to Suppah as soon as it obtained the records.

3.      Trial Court's Ruling

During its oral ruling, the trial court stated, "It's kind of a unique circumstances [sic] where the lead detective is unaware that there is a skip trace warrant out there; didn't know about it. Another detective in the same agency did, but he did not." VRP (June 15, 2017) at 25. The trial court denied Suppah's motion to dismiss.

The trial court entered written findings that stated in relevant part:

I.

> [Suppah's trial counsel] is not the defendant's first attorney. It does not appear that [Suppah's first counsel], made any specific formal request for the pen trap and trace documents relating to the cell phones. [Suppah's first counsel's] discovery demand does request all search warrants.

II.

[Suppah's trial counsel] first appeared for the defendant on October 26, 2016. Sometime after his notice of appearance, [Suppah's trial counsel] requested copies of "pen trap and trace" documents and/or documents authorizing use of the "Stingray" or cell site simulator.

III.

The State's response to [Suppah's trial counsel's] request for those documents was timely and prompt. The lead detective in this case, Det. Rock, did not have copies of any of those documents in the case file. The only way for the State to obtain the documents was to get an order from the court that unsealed files in the Pierce County Clerk's Office.

IV.

Once the State obtained the unsealed documents, it provided copies to the defense of all of those documents in a prompt and timely fashion.

V.

The court finds that there has been some mismanagement of the discovery in this case by the State. It is true that the State could have actively pursued the "trap and trace" documents prior to [Suppah's trial counsel's] formal request for those documents.

VI.

Dismissal of a criminal case is only a remedy if there has been egregious misconduct or gross mismanagement. The court finds there has been no misconduct by the State in this case. The court further finds that there has been no gross mismanagement of the case by the State.

. . . .

IX.

When there is misconduct or mismanagement of a criminal case by the State, the defense bears the burden of establishing that the defendant was prejudiced in the presentation of his defense from that action/inaction by the State. In this case, the defendant did not identify any prejudice that resulted from the timing of

the discovery of the trap and trace documents, especially given the number of trial continuances in this case that had nothing to do with the cell phone documents.

CP at 288-89. The trial court also entered the following conclusions of law:

I.

CrR 8.3(b) allows the court to dismiss a criminal case as an extraordinary or extreme remedy for misconduct or mismanagement by the State, and the State did not engage in the type of egregious misconduct or gross mismanagement in handling discovery in this case that would warrant dismissal of this case.

II.

The defendant bears the burden of proving some prejudice resulting from the State's misconduct or mismanagement of a criminal case. This defendant did not prove he was prejudiced by the timing of the discovery / disclosure of the trap and trace document.

III.

The defendant's motion to dismiss this case is denied.

CP at 290.

D.    MOTION TO SUPPRESS

1.    Suppah's Motion to Suppress

On July 5, 2017, Suppah filed a motion to suppress physical evidence. He sought suppression of

1. Blue Nokia Windows cell phone and the contents found therein that was found on John Suppah at the time of his apprehension and detention.

2. The black Samsung cell phone and the contents found therein that was found on John Suppah at the time of his apprehension and detention.

3. The fruits of the search of the Honda.

10

CP at 127-28. The motion was based on Suppah's argument that law enforcement did not comply with the trap and trace order because law enforcement used the cell site simulator before determining whether or not the pen register/trap and trace was unsuccessful, as required by the court order.

Suppah argued that although the cell site simulator locked on to the phone after the apprehension, there was no communication between the person monitoring the cell site simulator and the arresting officers as to whether or not the trap and trace worked, thus the arrest was in violation of the trap and trace orders.[5] Suppah also argued that the items found in the Honda should be suppressed because "[l]aw enforcement did not obtain information about the whereabouts [of] the vehicle until after apprehending Suppah and Lezard." CP at 149. Suppah further argued that the trap and trace orders did not comply with the statutory requirements because they did not contain geographic limits.

2.    Trial Court's Ruling

On August 13, 2018,[6] the trial court entered its written findings of fact and conclusions of law denying Suppah's motion to suppress. The trial court's written order stated that "[t]he State and defense each represented to the court what the facts were, and the court ultimately ruled that there was no need for testimony at the hearing because the facts that were relevant to the defendant's motion were all agreed." CP at 562.

---

[5] Suppah's motion to suppress primarily relied on the argument that the police used the cell site simulator without determining that the trap and trace device was unsuccessful as required by the court order. But Suppah does not make that argument on appeal.

[6] The trial court's oral ruling had been given in open court a year earlier on August 15, 2017.

The trial court found, in relevant part:

IV.

None of the trap and trace orders obtained by the police in this case have any geographic boundaries within the orders.

. . . .

VIII.

In the afternoon hours of December 21, 2015, Sprint provided information pursuant to a trap and trace order to Det. Buchanan that one of the cell phones was in Auburn, Washington. The information did not confine the cell phone to a particular location, but rather gave a rather large radius of area that should contain the phone. Det. Buchanan looked at the structures that were within that radius and determined that one of those was the Muckleshoot Casino, and he told that information to Det. Rock, who determined that detectives would go to the Casino to look for Nadine Lezard. Det. Rock, Det. Larsen, Det. Buchanan, and Sgt. John Durocher headed to the Casino. . . .

X.

When Suppah was caught, he was placed under arrest for his outstanding warrants, and he was searched incident to his arrest. Police found on Suppah among other things, two cell phones and a key fob. Suppah immediately stated the phones belonged to his girlfriend, Lezard. The key fob would later be used to locate a vehicle in the parking lot of the casino, which was determined to have been stolen.

CP at 564-66. Based on these facts, the trial court entered the following conclusions of law:

I.

The detectives lawfully obtained the information that was provided by Sprint pursuant to the trap and trace order for the cell phone that was eventually found on Suppah. That information included a generalized geographic location in which the police could find that cell phone as of the time of the information provided by Sprint, which in turn resulted in the arrest of Lezard and, by his proximity, defendant Suppah on his warrants.

II.

The court concludes as a matter of law that the absence of geographic boundaries in the trap and trace orders are not fatal to the validity of the orders, for several reasons, including the fact that this case involves a homicide, which likely means a court would issue those orders with nationwide boundaries, and also the fact that in this particular case, the information provided by Sprint led to a location that was within a short distance from the city of Tacoma and Pierce County.

. . . .

IV.

The phones were lawfully seized incident to Suppah's lawful arrest on warrants. The stolen vehicle that contained the shell casing was lawfully searched pursuant to a search warrant that was based on the information the officers had up to that time, including the interview of Lezard. Therefore, the court concludes as a matter of law there is no evidence in this case that is "fruit of the poisonous tree."

V.

The court has treated the issues in this motion as if defendant, John Suppah, has standing to challenge the issuance of a trap and trace order for a cell phone that is, by his own admission, Lezard's phone and not his phone. The court is not, by this ruling, holding as a matter of law that defendant Suppah in fact had standing under the law. Rather, the court concludes that the trap and trace orders were lawfully obtained, and the information provided to police lawfully acted upon to locate and arrest Lezard, and by proximity, Suppah, such that there is no need to formally rule on the issue of legal standing under these facts.

CP at 567-68.

E.      JURY TRIAL

1.      Opening Statements

Suppah's trial began on August 21, 2017. During his opening statement, the prosecutor stated that Lezard must tell the truth as a condition of her plea deal.[7] The prosecutor also stated during opening statements that a blue Nokia cell phone was used to message Stafford.

---

[7] Lezard pleaded guilty to second degree murder and testified as part of the cooperation agreement with the State.

13

2.    Eyewitness Testimony

a.    Nadine Lezard

Lezard, Suppah's ex-girlfriend, testified that the week prior to being arrested, she was with Suppah the entire time. In the fall of 2015, Lezard had a blue Nokia cell phone with Sprint as the service provider. She gave the cell phone to Suppah sometime between December 5 and December 10. Suppah controlled the cell phone in the two week period up to when they got arrested. When asked, "Why didn't you demand 'Give me my phone back. I want my phone,'" Lezard responded, "I'm sure he wouldn't give it to me." 5 VRP (Aug. 23, 2017) at 647. She was afraid of Suppah. Suppah had access to her Facebook Messenger. Messages on her phone between her Facebook account and Stafford were sent by Suppah.

Lezard and Suppah had met Stafford at a casino in mid-October 2015. She communicated with Stafford via Facebook Messenger. Lezard was aware that Stafford owed Suppah money for a drug deal.

In the two or three hours before the shooting on December 19, 2015, Lezard had been in Watts' hotel room. She and Suppah had driven to the hotel in a silver Honda. Lezard, Suppah, and Watts left the hotel in the Honda to go to Tacoma and talk to Stafford. Lezard assumed it was about "the money issue." 5 VRP (Aug. 23, 2017) at 665. Suppah was driving, Lezard was in the passenger seat, and Watts was in the back. They pulled over to the side of the street, and Suppah texted Stafford from a black prepaid ZTE cell phone.

Stafford walked up from behind and came to the car. Stafford opened the back door and leaned inside. Lezard testified, "And that's when John Suppah raises his arm with the gun and shoots him." 5 VRP (Aug. 23, 2017) at 685. After Suppah fired the gun, he said, "'That's what

you get for owing a motherf****r money.'" 5 VRP (Aug. 23, 2017) at 686. Watts closed the door, and they drove off.

Suppah, Lezard, and Watts drove to a casino. They later dropped off Watts at the hotel. After they found out that Stafford had died, either Lezard or Suppah changed her cell phone number. She and Suppah went to a Verizon store to get Suppah a new cell phone. Suppah also traded the gun he used for drugs.

When Suppah and Lezard were arrested, they had been at the casino the entire day. After Lezard was arrested, she told the officers about the shooting, although she left out Watts's name. Lezard identified Suppah as the shooter at that time.

b.      Thomas Watts

Watts testified that he had stayed at a hotel in Kent for about one month. He used the name Jim Brown.

He met Suppah the day of or the day before the incident. He met Lezard later on the same day. On the day of the shooting, he, Suppah, and Lezard left his hotel together in a Honda to find Watts's car, which had been stolen. Suppah told him on the way that they had to pick up some money from somebody. Watts did not know they were going to see someone before that.

Watts was in and out of sleep in the back seat. He saw Lezard on the blue cell phone. Suppah also used the blue cell phone—"I remember him grabbing the phone from her and then typing in something." 6 VRP (Aug. 24, 2017) at 975. Watts testified that he could tell that Lezard was afraid of Suppah.

Watts testified that someone opened the back door. A man leaned in. Suppah drew a gun from his breast pocket and fired a shot. Suppah used a semiautomatic Colt gun, which ejects a

15

spent casing. Suppah yelled something at the person he shot. Then they sped off in the car and drove to the casino. After that, they drove back to the hotel. The housekeeper was in the room next to his.

Watts was arrested in late January 2016. He pleaded guilty to first degree rendering criminal assistance.

###### c. Other lay witnesses

Aman Prett Johall, the general manager of the hotel, testified that detectives asked her for surveillance cameras recording from the facility. The police were particularly interested in room 135, where a guest under the name James Brown had stayed.

Delia Lopez, a housekeeper at the hotel in December 2015, was staying in room 136. She testified that she saw many different people go in and out of room 135. The main people were "two males and one female." 4 VRP (Aug. 22, 2017) at 502. Lopez identified Suppah as one of the people in room 135.

David Legge testified that in November and early December 2015, he saw Suppah and Lezard almost every day. Suppah would take Lezard's phone and go through her text messages. Suppah did not let anyone get close to Lezard. Suppah contacted Legge about trading his pistol for drugs. The pistol that Suppah traded was a black semiautomatic. Legge facilitated this trade.

Rizalina Caluza testified that her daughter owned a Honda Accord, which was registered to her home address. The car was taken on December 17, 2015. She did not give anyone permission to take the car.

### 3. Law Enforcement Testimony

#### a. Officer Frisbie

Officer Frisbie testified that he responded to the shooting incident involving Stafford. Stafford had a single gunshot wound but was alive when Officer Frisbie arrived. Stafford stated that he was waiting for Lezard. Stafford approached a silver car, and they fired a shot out of the vehicle and fled. Stafford said that the shooter was a Black male in his 20s or 30s. One of the occupants of the vehicle said that Stafford owed him or her money.

While at the scene of the shooting, someone handed Officer Frisbie Stafford's phone. He found Stafford on Facebook and found Lezard on Stafford's friend's list.

#### b. Detective Nasworthy

Detective Jack Nasworthy, with the Tacoma Police Department, testified that Detective Rock asked him to plot the approximate location of Lezard's cell phone in relation to the date and time of the shooting and the location of the shooting. The time range he looked at was December 18 at 11:00 p.m. to December 19 at 4:30 a.m. The number he looked at was the number ending in 9441. For this phone, Sprint only recorded voice calls, not text messages or Facebook Messenger messages. When looking for co-conspirators and witnesses, Detective Nasworthy looked for the highest number of calls made. He identified a phone number ending in 2247, which was Watts's number. He also took pictures of Stafford's phone which included Facebook messages with Lezard.

#### c. Detective Rock

Detective Rock testified that he was the lead detective on the case. Lezard became a suspect because they found messages between Lezard and Stafford "saying that she was there, she

17

is in the car. He was meeting up with her, and he ends up passed away right in the area where that was happening at . . . about the same timeframe." 8 VRP (Aug. 30, 2017) at 1314. As part of the investigation, officers retrieved pictures of the messages from Stafford's phone and found Lezard's phone number—ending in 9441—listed in three old reports. Officers also contacted Lezard's ex-brother-in-law, who told law enforcement that Suppah was Lezard's boyfriend. The investigation also revealed that the number ending in 9441 was a Sprint number.

Law enforcement obtained search warrants for the Sprint records related to the phone number ending in 9441, as well as a trap and trace order for that number. Sprint informed law enforcement that the phone number had been changed. Sprint gave them a new number—ending in 9468—that the account had been changed to, so they sought a trap and trace search warrant for that phone number.

Law enforcement also discovered a third phone number related to the investigation, ending in 5627, from Lezard's daughter, who stated that she had received a message from Lezard from this Verizon number. Law enforcement obtained a pen, trap, and trace order for that Verizon number.

Detective Rock also testified that he wrote the probable cause statements, which Detective Buchanan used to write an application for the trap and trace orders. The latitude and longitude of the pings resulting from the orders came from Sprint via email to Detective Buchanan. The emails were not sent to Detective Rock. Detective Rock ultimately got a copy of the ping emails from Sprint and provided it to Suppah. He turned them over to Suppah during the trial because "nobody had requested it, as far as [he] knew." 10 VRP (Sept. 1, 2017) at 1585.

Detective Rock further testified that they had some information that there was more than one person involved in the shooting. Law enforcement knew that there were three people in the vehicle and "[p]ossibly a black male in the front seat." 8 VRP (Aug. 30, 2017) at 1326. The vehicle was described as a silver Jetta. When Detective Rock received a call from Detective Buchanan that they were getting pings from the vicinity of a casino, Detective Rock gave pictures of Lezard and Suppah to the other detectives. Before going to the casino, they had no information that Suppah was involved in the death of Stafford, but Suppah did have outstanding warrants.

He received a call from Detective Buchanan stating that Lezard had been spotted. Detective Rock went to the casino and spotted Suppah as well. They arrested Lezard. Suppah started running as the other detectives approached him, but Suppah was eventually taken into custody based on the outstanding warrants.

Detective Rock conducted Lezard's post-arrest interview. Lezard told him about the hotel and that a third person had rented the room. Lezard did not, however, identify the third person in the vehicle. Lezard also told them the Honda was parked at the casino.

Detective Rock obtained videos from the hotel. The silver car in the video footage from the hotel is similar to the one that Suppah and Lezard drove to the casino the night that they were arrested.

Given the information Lezard provided, Detective Rock looked for video footage of Suppah and Lezard at the casino an hour after the shooting. Through their interactions with casino security, they were able to identity Watts as the third person involved in the shooting. They put out a bulletin for Watts as a person of interest in a homicide. Detective Rock also enlisted members of the special weapons and tactic team to help find Watts.

19

Watts was later located and apprehended. Watts talked to them about the shooting.

Detective Rock also testified that Suppah completed a packet of handwriting samples. Detective Rock obtained a search warrant for Suppah's jail cell for other writing samples.

>        d.        Detective Buchanan

Detective Buchanan testified that he obtained trap and trace orders for the cell phone numbers associated with Lezard. The cell phone provider was Sprint.

On December 21, 2015, Detective Buchanan received information via email from Sprint relating to one of the cell phones. Sprint sent latitude and longitude information regarding the location of the cell phone. That information tells the police that the cell phone is in an approximate area of that latitude and longitude. The information placed the cell phone in the general vicinity of the casino. Detective Buchanan notified Detective Rock of this information, and they headed to the casino with Detective Hoisington, Detective Larsen, and Sergeant Durocher.

Detective Buchanan also testified that at that point, they knew of Suppah, but they did not have any information that tied him to the Stafford homicide investigation. Suppah, however, had some outstanding warrants for his arrest. He saw Lezard and Suppah in the casino. Suppah ran when he saw law enforcement, but he was apprehended.

>        e.        Detective Larsen

Detective Larsen testified that he and Detective Rock had determined they had to arrest Lezard. They looked at her Facebook account and saw pictures of her. They found Suppah's name associated with Lezard. Detective Larsen knew that trap and trace orders had been obtained to locate the cell phones. He also knew that Detective Buchanan and Detective Terry Krause were getting email notifications from the cell phone service providers.

Detective Larsen also testified that Detective Rock called him on December 21 to say that the cell phones were pinging at the casino. They went to the casino, and Detective Rock arrested Lezard after Detective Buchanan spotted her.

Suppah ran when he saw the detectives but was apprehended. A search of Suppah incident to arrest revealed a black Samsung cell phone,[8] a blue Nokia cell phone, two wallets, and a Honda key fob. When Detective Larsen took the blue Nokia cell phone from Suppah's jacket pocket, Suppah said, "'That's my girlfriend's phone. Tell her I love her.'" 8 VRP (Aug. 30, 2017) at 1286.

4.      Forensics Testimony

John Matthew Lacy, a medical examiner at the Snohomish County Medical Examiner's Office, testified that he conducted an autopsy of Stafford. Dr. Lacy recovered a bullet from the body and determined that the cause of death of Stafford was a "[g]unshot wound to the abdomen. Homicide." 4 VRP (Aug. 22, 2017) at 467.

Cresdeen Saldivar-Roller, a forensic specialist with the Tacoma Police Department, testified that she took pictures of a Honda Accord on December 24, 2015. Saldivar-Roller testified that she found a spent shell casing inside the car. There were no fingerprints on the shell casing. She found fingerprints in the car.

Toni Martin, a latent print examiner for the Tacoma Police Department, testified that she received fingerprints from Saldivar-Roller. She compared these fingerprints with the fingerprints of Stafford, Suppah, Lezard, and Watts. She found that Lezard's fingerprints were inside the car,

---

[8] Suppah purchased the Samsung cell phone from Verizon about one day after the shooting.

but she could not identify the other three individuals as having been in the car based on the fingerprints that she had.

Brenda Walsh, a forensic scientist with the Washington State Patrol Crime Laboratory, testified that she looked at a fired cartridge case and a fired bullet in this case. She testified that the cartridge was fired from a semiautomatic pistol—"a .380 auto." 8 VRP (Aug. 30, 2017) at 1197. The bullet was a .380 auto bullet. There was nothing inconsistent about the casing being fired from a Colt .380.

In addition to the above testimony, the State successfully moved to admit internet search history from one of the cell phones found on Suppah, which included searches related to Stafford's shooting, homicide investigations, and how to get a fake identity with the name Arthur John Suppah.

5.    Evidence Regarding Witness Tampering

Lezard testified that she and Suppah were not allowed to contact each other while they were in jail, but she received letters from Suppah. The first letter was addressed to her but had a return address of someone outside the jail. When she opened the letter, she realized it was from Suppah based on the handwriting and contents. Lezard testified that the letter stated that

> he wanted me to go along with some story that went along with what the original statement was for Preston Stafford, that he was saying I should say that it was a black guy driving, that he wasn't there, that I was threatened by this black guy, he was threatening my life and that's why I went along in the car and this happened. He was threatening my kids. To make sure that I remember his small kindnesses and then not to point the finger at him.

5 VRP (Aug. 23, 2017) at 740-41.

The second letter was addressed to someone else with Lezard as the sender. "It was boomeranged out and sent back to me."[9] 5 VRP (Aug. 23, 2017) at 742. She knew it was from Suppah and did not open it.

Suppah wrote several other letters, which Lezard had not read. She looked at the letters at trial and recognized the handwriting to be Suppah's.

Jonathan Blind, a corrections deputy with the Pierce County Sheriff's Department, testified that on the night of February 21, 2016, he worked a shift that was responsible for all mail collection. He checked the mail to ensure that everything looked right.

During his shift, Deputy Blind noticed a female name, Nadine Lezard, on the return address of a piece of mail. At the time, he did not know which male inmate the letter came from. He and his sergeant opened the letter and read it. Deputy Blind testified:

> The thing that got me was, when the inmate, who wrote this letter, said, you can write me back using your booking number. . . . He goes, use return address label, write Joann instead of John, and his booking number, which is the same number as hers, but with the last number "4." They were arrested around the same time.

7 VRP (Aug. 28, 2017) at 1122. The envelope had Lezard's booking number of 2015355051. Deputy Blind looked up booking number 2015355054, and the inmate associated with that number was Suppah. Deputy Blind and the sergeant sent the letter off to the prosecutor's office.

Dayna Hersey, a corrections deputy with the Pierce County Sheriff's Department, testified that she was on mail duty in January and February 2016. She became aware of multiple letters

---

[9] The term "boomerang" means circumventing the jail mail system by sending a letter out to an address that is fictitious, knowing that the post office will return that piece of mail to the sender listed on the envelope, who is not the true sender but the anticipated recipient of the communication.

that had a particular inmate's return information on it that had been returned to sender. Around the end of February, she was assigned to do an investigation related to Suppah. She listened to his recorded phone calls from the jail and heard conversations about letters sent or received from the jail. On one call, the person speaking with Suppah stated, "I'm not forwarding letters to your friends. I'm not doing any of that shit." 7 VRP (Aug. 28, 2017) at 1158. Suppah responded, "[N]ot just one time? Because it will save my life." 7 VRP (Aug. 28, 2017) at 1158. In another call, Suppah said, "[D]id you get the letter I sent you?" 7 VRP (Aug. 28, 2017) at 1160. The person on the other end of the line replied, "I did. I sent it to your girl." 7 VRP (Aug. 28, 2017) at 1160.

Andrew Szymanski, who is employed with the Washington State Patrol Crime Laboratory, testified that he conducted handwriting comparisons and wrote reports that documented his work on this case. He examined four "questioned letters" (Exhibits 26, 27, 28, and 30), which were the letters in question given to him by the Tacoma Police Department. 4 VRP (Aug. 22, 2017) at 534. He compared the four letters to an exemplar by Suppah. Szymanski reached no conclusions regarding the writings on the letters and envelopes, which meant that Suppah could be neither identified nor eliminated as the writer. However, Szymanski noticed indented handwriting on Exhibit 28, which had indications that Suppah wrote the signature. After examining a second set of known documents of Suppah's handwriting, Szymanski concluded that there was strong evidence that Suppah was probably the source of the indented signature.

F.     VERDICT AND SENTENCING

The jury found Suppah guilty of second degree felony murder, drive-by shooting, second degree unlawful possession of a firearm, unlawful possession of a stolen vehicle, and both counts

of tampering with a witness.[10] The jury also returned a special verdict finding Suppah was armed with a firearm at the time he committed the murder.

At sentencing, Suppah moved to dismiss the second degree felony murder conviction, arguing that the "assault, which is the foundation for the murder, is not sufficiently distinguished from the actual killing itself." 14 VRP (Sept. 8, 2017) at 1861. The trial court denied the motion.

The trial court sentenced Suppah to 587 months in confinement. The criminal history in the judgment and sentence listed several gross misdemeanor convictions for sex offenses and failure to register as a sex offender, but it did not list any felony sex offenses.

G.      APPEAL AND EVIDENTIARY HEARING

Suppah appealed to this court. One of the State's arguments on appeal was that Suppah lacked standing to challenge the trap and trace orders. Because the trial court had not ruled on the standing issue, this court remanded for the trial court to hold an evidentiary hearing on Suppah's standing to challenge the trap and trace orders. The trial court received briefing from both parties prior to the evidentiary hearing. In this briefing, the State reversed its position and conceded that Suppah had standing to challenge the trap and trace orders.

Despite the State's concession on standing, the trial court held an evidentiary hearing at which Detective Larsen, Detective Rock, and Suppah testified. Detective Larsen testified that, prior to Suppah's arrest, he knew that Suppah had an outstanding felony arrest warrant for failure

---

[10] The jury found Suppah not guilty of first degree murder (count 1) but found him guilty of the lesser crime of first degree manslaughter. It appears that the trial court chose to only enter the second degree felony murder conviction (count 2) for double jeopardy reasons as the State made arguments at sentencing regarding double jeopardy on the murder convictions. The second degree felony murder conviction appears on the judgment and sentence, but the first degree manslaughter conviction does not.

to register as a sex offender. Detective Larsen also testified that, with an outstanding felony arrest warrant, department policy required him to arrest the person and serve the warrant. Detective Rock testified that Suppah had felony warrants for his arrest and that it was policy to make an arrest for felony warrants. Detective Larsen testified that he believed Suppah might be worth talking to if they found him with Lezard, but Suppah was not a suspect in Stafford's shooting.

The trial court made written findings of fact and conclusions of law following the evidentiary hearing. In relevant part, the trial court found:

### VII.

Because Suppah was a known associate of Lezard at this point, detectives ran Suppah's name in police databases and found he had several outstanding arrest warrants, including one for the felony crime of Failure to Register as a Sex Offender.

. . . .

### X.

When the officers entered the casino, their sole focus was on finding Nadine Lezard. If they happened upon John Suppah, they intended to custodially arrest him on his warrants, which was mandated policy at the time because one of the warrants (failure to register) was a "felony warrant." When they entered the casino, the officers had no information that would cause any of them to suspect Suppah was in possession of Lezard's phone.

. . . .

### XX.

There is no dispute that the blue Nokia phone was in John Suppah's possession when he was placed under arrest for his warrants.

### XXI.

There is no evidence that suggests John Suppah illegally obtained Lezard's cell phone from her or obtained it by use of threat or force.

26

CP at 590, 591, 594-95.

The trial court also made the following relevant conclusions of law:

I.

Under Washington law, "cell phones, including the data that they contain," are a person's "private affairs" under Wa. Const. Art I, Sec. 7. The "data" includes real-time cell site location information. And the privacy interest even extends to text messages found on a recipient's phone. Federal law concludes the privacy right extends to historical CSLI and not just real-time CSLI.

II.

The evidence presented at this hearing (and from Lezard's testimony at trial), establishes that defendant John Suppah possessed and used Lezard's blue Nokia cell phone, on at least a frequent basis, during November and December 2015, including December 19 to 21, 2015. Because current case law does not appear to distinguish between the owner of a cell phone and a user of a cell phone, Suppah has a privacy interest in the blue Nokia cell phone, and he has standing to challenge the trap and trace orders that were issued for Lezard's cell phone.

CP at 595 (citations omitted). Suppah filed a motion for reconsideration regarding specific findings of fact, which the trial court denied as untimely.

Following the trial court's evidentiary hearing and entry of an order on standing to challenge the trap and trace orders, this court allowed supplemental briefing from Suppah and the State on the application of the exclusionary rule.

ANALYSIS

A.    CrR 8.3 MOTION TO DISMISS

Suppah argues that the government's mismanagement in the discovery process prejudiced his right to a fair trial. Specifically, Suppah contends that the State's mismanagement placed him in a position of either "waiv[ing] his right to a speedy trial or proceed[ing] with counsel who was

unprepared to address the issues presented by the trap and trace warrants." Br. of Appellant at 23. Thus, according to Suppah, the trial court erred in denying his motion to dismiss. We disagree.

We review the trial court's decision on a motion to dismiss for abuse of discretion. *State v. Blackwell*, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993); *State v. Miller,* 92 Wn. App. 693, 702, 964 P.2d 1196 (1998), *review denied,* 137 Wn.2d 1023 (1999). "Discretion is abused when the trial court's decision is manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons." *Blackwell*, 120 Wn.2d at 830. We will find a decision manifestly unreasonable "if the court, despite applying the correct legal standard to the supported facts, adopts a view 'that no reasonable person would take.'" *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003) (quoting *State v. Lewis,* 115 Wn.2d 294, 298, 797 P.2d 1141 (1990)). A decision is based on untenable grounds "if it rests on facts unsupported in the record or was reached by applying the wrong legal standard." *Id.*

"[A] trial court may not dismiss charges under CrR 8.3(b) unless the defendant shows by a preponderance of the evidence (1) 'arbitrary action or governmental misconduct' and (2) 'prejudice affecting the defendant's right to a fair trial.'" *Id*. (quoting *State v. Michielli*, 132 Wn.2d 229, 239-40, 937 P.2d 587 (1997)). "Governmental misconduct . . . 'need not be of an evil or dishonest nature; *simple mismanagement is sufficient.*'" *Michielli*, 132 Wn.2d at 239-40 (quoting *Blackwell*, 120 Wn.2d at 831). However, Washington courts have maintained that dismissal is a remedy only in "'truly egregious cases of mismanagement or misconduct.'" *State v. Wilson*, 149 Wn.2d 1, 9, 65 P.3d 657 (2003) (quoting *State v. Duggins*, 68 Wn. App 396, 401, 844 P.2d 441 *aff'd*, 121 Wn.2d 524 (1993)). A defendant can show prejudice affecting his right to a fair trial by showing prejudice to "the 'right to be represented by counsel who has had sufficient opportunity

to adequately prepare a material part of his defense.'" *Michielli*, 132 Wn.2d at 240 (quoting *State v. Price*, 94 Wn.2d 810, 814, 620 P.2d 994 (1980)).

Dismissal under CrR 8.3(b) is an extraordinary remedy that the trial court should use only as a last resort. *State v. Brooks,* 149 Wn. App. 373, 384, 203 P.3d 397 (2009). "[T]he question of whether dismissal is an appropriate remedy is a fact-specific determination that must be resolved on a case-by-case basis." *State v. Sherman*, 59 Wn. App. 763, 770-71, 801 P.2d 274 (1990).

1.    Misconduct

Suppah argues that there was misconduct because Suppah's first counsel had asked for all search warrants in his discovery request, and the State failed to turn over the trap and trace orders. Only after Suppah's trial counsel learned from an arresting officer that a trap and trace had been used to complete the arrest did the State have the applications and orders unsealed.

CrR 4.7(d) states:

Upon defendant's request and designation of material or information in the knowledge, possession or control of other persons which would be discoverable if in the knowledge, possession or control of the prosecuting attorney, the prosecuting attorney shall attempt to cause such material or information to be made available to the defendant.

Here, Suppah's first counsel requested on December 29, 2015, "[a] copy of all applications, affidavits, declarations and statements in support of search warrants issued in this case," as well as "[a] copy of all executed and unexecuted search warrants issued in the investigation of the above referenced case." CP at 14. When Suppah's trial counsel filed his notice of appearance on October 26, 2016, another demand for discovery was made. This discovery demand was also general and did not specify warrants or trap and trace orders. The State did not provide any discovery regarding the trap and trace orders pursuant to the two discovery demands. During an interview with one of

29

the arresting officers on April 6, 2017, just over a month before the scheduled trial date, Suppah's trial counsel became aware that a trap and trace might have been used.

At the hearing on the motion to dismiss, the State argued that Suppah did not specifically request the trap and trace warrants, that the detectives did not have the trap and trace search orders, and that Detective Rock did not know they existed.[11] The State noted, however, that Detective Buchanan, who wrote the applications for the trap and trace order, said they were filed under seal. The State asserted that it had obtained an order to unseal the records and gave them to Suppah as soon as the State obtained them.

Based on the facts above, the trial court found that there was some mismanagement because the prosecution could have actively pursued the trap and trace documents before defense counsel formally requested them. However, while simple mismanagement is sufficient to find governmental misconduct, the remedy of dismissal is based on egregious mismanagement or misconduct, which the trial court concluded did not occur. This was the correct legal standard for deciding a motion to dismiss based on misconduct. *Wilson*, 149 Wn.2d at 9.

The trial court did not adopt a view that no reasonable person would take, as the trap and trace orders were not specifically requested, the detectives did not have the trap and trace orders, the trap and trace orders were filed under seal with the court, and the State diligently worked to unseal the records when Suppah inquired about them and promptly provided the records to Suppah

---

[11] This was an apparent misstatement as Detective Rock testified during the trial that they got trap and trace orders for the cell phones. Detective Rock wrote the probable cause statements, which Detective Buchanan used to apply for the trap and trace orders.

after they were unsealed by court order. Therefore, the trial court did not abuse its discretion by finding that there was no egregious mismanagement warranting dismissal.

2.      Prejudice

Suppah argues that the State's misconduct prejudiced his right to a fair trial by "forcing him to either waive his right to a speedy trial or proceed with counsel who was unprepared to address the issues presented by the trap and trace warrants." Br. of Appellant at 23. The trial court concluded that the timing of the discovery did not prejudice Suppah.

"[P]rejudice includes the right to a speedy trial and the 'right to be represented by counsel who has had sufficient opportunity to adequately prepare a material part of his defense.'" *Michielli*, 132 Wn.2d at 240 (quoting *Price*, 94 Wn.2d at 814). Our Supreme Court has stated that the defendant "must prove by a preponderance of the evidence that interjection of new facts into the case when the State has not acted with due diligence will compel him to choose between prejudicing" the right to a speedy trial or the right to be represented by counsel who has had the opportunity to be adequately prepared. *Price*, 94 Wn.2d at 814.

Suppah relies on *Sherman*. In *Sherman*, the State failed to produce Internal Revenue Service (IRS) records after agreeing to do so pursuant to an omnibus order, amended the information eight days after the trial was scheduled to begin, filed a late motion to reconsider the omnibus order, and attempted to expand the witness list on the day of trial. *Sherman*, 59 Wn. App. 765-66, 768. The court stated that the failure to produce the IRS records when the case came to trial was itself a sufficient ground on which to dismiss the case. *Id*. at 768. The court held that the fact that the State did not have physical control of the records or that the defendant did not independently attempt to locate the records does not excuse the State's actions. *Id*. at 769. This

is because the State had agreed to provide the IRS records. *Id.* The court further noted that the speedy trial expiration date had been extended seven times and was scheduled to expire again on the day the case was dismissed. *Id.* The court held that to require the defendant to "request a continuance under these circumstances would be to present her with a Hobson's choice." *Id.*

Here, unlike in *Sherman*, the State provided Suppah the trap and trace applications and orders on April 28, 2017, three weeks before trial was to begin. The amount of new discovery was 88 pages. Suppah moved for an order of dismissal and alternatively for an order continuing trial on May 16, 2017, three weeks after the disclosure of the trap and trace orders and one day before the scheduled trial date. The trial court was handed a copy of this motion when the judge took the bench on May 16, 2017, the day before the case was set for trial. Because the trial court did not have time to review the motion to dismiss, the trial court continued the trial date. This continuance was the fifth trial date continuance. The previous four continuances had either been agreed to by Suppah or initiated by Suppah. These facts do not show that the State compelled Suppah to choose between prejudicing his right to a speedy trial or having effective representation. Therefore, the trial court did not abuse its discretion in concluding that Suppah was not prejudiced by the timing of the discovery.

Because both governmental misconduct and prejudice must be shown on a CrR 8.3(b) motion to dismiss, Suppah's challenge fails.

B.      MOTION TO SUPPRESS

Suppah argues that the trial court erred by denying his motion to suppress evidence obtained as a result of the trap and trace order on the blue Nokia cell phone because the use of trap and trace violated his right to be free of unreasonable searches and seizures as guaranteed by article

I, section 7 of the Washington Constitution. Specifically, Suppah argues that the trial court erred because the evidence in Suppah's possession when he was arrested should have been excluded.

1.    Standing

As a threshold matter, this court must determine whether Suppah has standing to challenge the trap and trace order for the blue Nokia cell phone. In its original briefing to this court, the State argued that Suppah did not have standing. On remand to the trial court for an evidentiary hearing on Suppah's standing to challenge the trap and trace order, the State conceded that Suppah had standing to challenge the trap and trace order. We accept the State's concession.

A defendant must have standing to challenge a search or seizure under article I, section 7. *See State v. Libero*, 168 Wn. App. 612, 616, 277 P.3d 708 (2012). To have standing, the defendant must have a legitimate expectation of privacy in the place searched or the thing seized. *Id*. A person has a constitutionally protected privacy interest in their cell phone and cell phone data under article I, section 7. *State v. Samalia*, 186 Wn.2d 262, 272, 375 P.3d 1082 (2016). A person does not need to formally own a cell phone to have a privacy interest in the phone or its data. *See State v. Hinton*, 179 Wn.2d 862, 873, 319 P.3d 9 (2014). Our Supreme Court has held that a warrantless search of a third party's cell phone violates a defendant's rights under article I, section 7 where the defendant's text messages were delivered to the phone that was searched. *Id*. at 877.

Here, the trap and trace order was for a blue Nokia cell phone that was owned by Lezard. However, Suppah possessed and used that blue Nokia cell phone, on at least a frequent basis, during November and December 2015. Suppah possessed the blue Nokia cell phone on the night of his arrest, when the trap and trace on the cell phone led law enforcement to his location. As the trial court acknowledged on remand, current search and seizure case law has not distinguished

between the owner and user of a cell phone when determining a person's privacy interest in that cell phone. Instead, case law supports a conclusion that Suppah had a privacy interest in the blue Nokia cell phone that was in his possession and contained data from Suppah's frequent use. *See Hinton*, 179 Wn.2d at 877. Therefore, we accept the State's concession that Suppah has standing to challenge the trap and trace order for that cell phone.

      2.     Validity of Trap and Trace Order

Because Suppah has standing to challenge the trap and trace order, we address Suppah's argument that the trial court erred by denying his motion to suppress. Suppah does not assign error to any specific finding or conclusion in the trial court's order denying his motion to suppress. However, Suppah's arguments in his opening brief make clear that he is challenging conclusion 2, which states that

> [t]he court concludes as a matter of law that the absence of geographic boundaries in the trap and trace orders are not fatal to the validity of the orders, for several reasons, including the fact that this case involves a homicide, which likely means a court would issue those orders with nationwide boundaries, and also the fact that in this particular case, the information provided by Sprint led to a location that was within a short distance from the city of Tacoma and Pierce County.

CP at 567. Suppah argues that the trap and trace order was invalid because it lacked geographic limits. We agree.

The Fourth Amendment of the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." "If a government action intrudes on an individual's 'reasonable expectation of privacy,' a search occurs under the Fourth Amendment." *State v. Martinez*, 2 Wn. App. 2d 55, 64, 408 P.3d

34

721 (quoting *Katz v. United States*, 389 U.S. 347, 360-61, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (Harlan, J., concurring)), *review denied*, 190 Wn.2d 1028 (2018).

"The Washington Constitution provides greater protection of a person's privacy rights than does the Fourth Amendment." *Id.* Article 1, section 7 of the Washington Constitution states, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." Article 1, section 7 "'focuses on those privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental trespass absent a warrant.'" *Martinez*, 2 Wn. App. 2d at 64 (quoting *State v. Myrick*, 102 Wn.2d 506, 510-11, 688 P.2d 151 (1984)).

"An analysis under article I, section 7 consists of a two-step inquiry: first, whether there has been a governmental intrusion into one's home or private affairs (the 'private affairs' prong); and, if so, whether authority of law justifies the intrusion (the 'authority of law' prong)." *State v. Chenoweth*, 160 Wn.2d 454, 463, 158 P.3d 595 (2007). Cell phone location information held by a cell phone company is a "private affair." *State v. Denham*, 197 Wn.2d 759, 766, 489 P.3d 1183 (2021).

Appellate review of a denial of a motion to suppress requires the court to determine "whether substantial evidence supports the challenged findings of fact and whether the findings support the conclusions of law." *State v. Garvin,* 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). "'Substantial evidence' is evidence sufficient to persuade a fair-minded, rational person that the findings are true." *State v. Smith*, 185 Wn. App. 945, 956, 344 P.3d 1244, *review denied*, 183 Wn.2d 1011 (2015). We review de novo legal conclusions on a motion to suppress. *Hinton*, 179 Wn.2d at 867.

Here, the trap and trace on the blue Nokia cell phone provided law enforcement with cell phone location information held by a cell phone company. Therefore, the trap and trace invaded Suppah's private affairs, and law enforcement was required to have authority of law justifying the trap and trace. *See Denham*, 197 Wn.2d at 766; *Chenoweth*, 160 Wn.2d at 463.

The record shows that the police obtained a court order prior to using a trap and trace on the blue Nokia cell phone. Thus, the question here is not whether an order was necessary to meet the "authority of law" requirement but whether the order itself lacks "authority of law" if the order omits the geographical limits required by statute.

The authority of law comes from chapter 9.73 RCW (Privacy Statutes). In interpreting a statute, this court looks first to the statute's plain language. *State v. Keller*, 143 Wn.2d 267, 276, 19 P.3d 1030 (2001), *cert. denied*, 534 U.S. 1130 (2002). If the statute's plain language is unambiguous, our inquiry is at an end, and we enforce the statute "in accordance with its plain meaning." *State v. Armendariz*, 160 Wn.2d 106, 110, 156 P.3d 201 (2007). We review questions of statutory interpretation de novo. *State v. Gonzales*, 198 Wn. App. 151, 153, 392 P.3d 1158, *review denied*, 188 Wn.2d 1022 (2017).

RCW 9.73.260(4)(c)(i) states, "The order shall specify . . . the geographic limits of the trap and trace order." The plain language of the statute states that the order "shall specify," which makes clear that the order must include the geographic limits. The plain language of the statute is clear and no further inquiry is required. *See Armendariz*, 160 Wn.2d at 110.

The trial court here found that "[n]one of the trap and trace orders obtained by the police in this case have any geographic boundaries within the orders." CP at 564. Despite that finding, the trial court concluded

as a matter of law that the absence of geographic boundaries in the trap and trace orders are not fatal to the validity of the orders, for several reasons, including the fact that this case involves a homicide, which likely means a court would issue those orders with nationwide boundaries, and also the fact that in this particular case, the information provided by Sprint led to a location that was within a short distance from the city of Tacoma and Pierce County.

CP at 567. This was error.

There is no exception laid out in the statute for an exception if a case involves a homicide. In fact, there is no language in the statute outlining any exceptions for types of cases. Also, the trial court engaged in pure speculation by saying that because this case involved a homicide, it is likely a court would issue a nationwide boundary. Finally, the trial court's rationalization that because the trap and trace order led to information about a location within a short distance from Tacoma and Pierce County is untenable. The trial court's reasoning would require a hindsight analysis to determine with no clear guidance whether the order without the statutorily required geographic limits yielded information that was a "short distance" from the crime scene and then determine whether that distance was "short" enough to justify finding a court order that fails to include the required geographic limits "valid."

The State argues that the geographic limits of the trap and trace order "can be readily inferred by this Court (as a matter of law) as anywhere on Earth." Br. of Resp't at 31-32. This argument lacks any merit because the statute would not have included a geographic limit requirement if the limit was anywhere on Earth. Also, the State's argument would render the statutory requirement that the trap and trace order include geographic limits superfluous. *See State v. Ervin,* 169 Wn.2d 815, 823, 239 P.3d 354 (2010) ("'[W]e interpret a statute to give effect to all

37

language, so as to render no portion meaningless or superfluous.'" (quoting *Rivard v. State*, 168 Wn.2d 775, 783, 231 P.3d 186 (2010)).

The State also argues substantial performance. However, the cases relied on by the State address substantial compliance by law enforcement in executing the warrant. *State v. Rupe*, 101 Wn.2d 664, 685, 683 P.2d 571 (1984) (plurality opinion) (holding that the *detective* substantially complied with the Privacy Statutes where he failed to specify the starting time of the polygraph examination); *State v. Jones*, 95 Wn.2d 616, 627, 628 P.2d 472 (1981) (holding that the *police officer* substantially complied with the Privacy Statutes where he did not begin the tape with a statement that the recording was being made); *State v. Knight*, 79 Wn. App. 670, 685-86, 904 P.2d 1159 (1995) (holding that *law enforcement* substantially complied with the Privacy Statutes where it submitted a report in an untimely fashion), *review denied*, 129 Wn.2d 1005 (1996); *State v. Gelvin*, 43 Wn. App. 691, 695-96, 719 P.2d 580 (holding there was substantial compliance with the Privacy Statutes where the *officers* failed to include an ending time on a taped statement), *review denied*, 106 Wn.2d 1008 (1986). The State has provided no authority to show that a court's *order* is valid if it substantially complies with statutory requirements. Therefore, we assume the State has found no relevant authority for its substantial performance argument. *See DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962) ("Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none.").

Because the geographic limits requirement is mandated by statute and the trap and trace order failed to include any geographic limit, the order was invalid. Therefore, the trial court erred

by concluding that the trap and trace order was valid. Law enforcement lacked the authority of law to trap and trace the blue Nokia cell phone.

### 3. Independent Source Doctrine and Fruit of the Poisonous Tree

Because law enforcement lacked the authority of law to use the trap and trace device, we must determine whether evidence obtained as a result of the trap and trace order should have been suppressed. Suppah argues that the physical evidence obtained following his arrest should have been suppressed, "including the phones and keys found on his person and the evidence discovered in the car to which those keys led." Br. of Appellant at 29 This argument is mostly consistent with Suppah's motion to suppress, which argued that the blue Nokia cell phone, black Samsung cell phone, location of the car, and evidence found in the car should be suppressed because the trap and trace orders were invalid.[12]

The State argues that no evidence should have been suppressed because law enforcement arrested Suppah on his outstanding arrest warrant and the independent source exception to the exclusionary rule applies.[13] We agree with the State.

---

[12] Suppah's motion to suppress also argued that the trial court should suppress "statements made by Mr. Suppah." CP at 149. The motion to suppress does not elaborate on which statements it is referring to, and the record does not shed light on what these statements might have been. At trial, the State did not introduce any statements that Suppah made to the police. On appeal, Suppah does not argue that any of his statements should have been suppressed. Therefore, we do not address whether any statement made by Suppah should have been suppressed as fruit of the poisonous tree.

[13] The State also makes arguments regarding the attenuation doctrine, but the attenuation arguments only pertain to Lezard's and Watts' testimony. Suppah's motion to suppress did not seek to exclude Lezard's or Watts' testimony, and Suppah does not make arguments on appeal regarding their testimony. Therefore, we do not address the State's arguments regarding the attenuation doctrine.

a.  Findings of fact

Suppah's supplemental brief assigns error to two of the trial court's findings in its order on standing.  Suppah assigns error to finding 7, which states in relevant part that "[Suppah] had several outstanding arrest warrants, including one for the felony crime of Failure to Register as a Sex Offender."  CP at 590.  Suppah also assigns error to finding 10, which states in relevant part that officers "intended to custodially arrest [Suppah] on his warrants, which was mandated policy at the time because one of the warrants (failure to register) was a 'felony warrant.'"  CP at 591.  Suppah contends that these findings were made in error because the criminal history in Suppah's judgment and sentence does not list a felony conviction for sex offense or for felony failure to register as a sex offender; the criminal history only lists one gross misdemeanor conviction for a sex offense and four gross misdemeanor convictions for failure to register as a sex offender.

As to the challenged findings, Detective Larsen and Detective Rock both testified at the evidentiary hearing on remand that Suppah had outstanding arrest warrants.  Both officers also testified that they were required by department policy to arrest Suppah on the outstanding felony arrest warrant.

The testimony from law enforcement as to Suppah's arrest warrants would persuade a fair-minded, rational person that Suppah had a felony arrest warrant.  And the testimony from law enforcement would persuade a fair-minded, rational person that officers intended to arrest Suppah on his outstanding felony arrest warrant as a matter of department policy.  Therefore, the trial court's findings 7 and 10, that Suppah had a felony arrest warrant for failure to register as a sex offender and that officers intended to arrest Suppah on that warrant as mandated policy, are supported by substantial evidence.  *See Smith*, 185 Wn. App. at 956.  To the extent Suppah asks

us to hold that the criminal history in the judgment and sentence is more convincing evidence, we do not reweigh evidence. *See State v. Ramos*, 187 Wn.2d 420, 453, 387 P.3d 650, *cert. denied*, 138 S. Ct. 467 (2017). Accordingly, the trial court did not err in making findings of fact 7 or 10.[14]

b.      Conclusion of law

Suppah did not assign error to any conclusions of law.[15] However, Suppah's supplemental brief makes clear that he is challenging parts of conclusion 4 of the trial court's denial of his motion to suppress, which states that

> [t]he phones were lawfully seized incident to Suppah's lawful arrest on warrants. The stolen vehicle that contained the shell casing was lawfully searched pursuant to a search warrant that was based on the information the officers had up to that time, including the interview of Lezard. Therefore, the court concludes as a matter of law there is no evidence in this case that is "fruit of the poisonous tree."

CP at 568.

i.      Phones lawfully seized incident to Suppah's lawful arrest

The first sentence of conclusion 4 states that "[t]he phones were lawfully seized incident to Suppah's lawful arrest on warrants." CP at 568. This conclusion of law is supported by finding of fact 10, which states that "[w]hen Suppah was caught, he was placed under arrest for his

---

[14] We note that even if Suppah only had outstanding arrest warrants that were not felony arrest warrants, the outcome is the same. As discussed below, outstanding arrest warrants allowed officers to arrest Suppah at the casino. While a felony arrest warrant would have *required* officers to arrest Suppah based on department policy, the officers were still *authorized* to arrest Suppah on his outstanding arrest warrants regardless of the underlying charges.

[15] Suppah did not assign error to any conclusions of law in his opening brief and only raised a new argument related to conclusion of law 4 in his supplemental brief *after* remand to the trial court for an evidentiary hearing on the standing issue. Although we exercise our discretion under RAP 1.2(c) to address this new argument, we remind counsel they must assign error for any relief sought. RAP 10.3(g).

outstanding warrants, and he was searched incident to his arrest." CP at 566. Thus, the trial court did not err in the first sentence of conclusion 4.

ii.     Search warrant for stolen vehicle

The second sentence of conclusion 4 states that "[t]he stolen vehicle that contained the shell casing was lawfully searched pursuant to a search warrant that was based on the information the officers had up to that time, including the interview of Lezard." CP at 568. Suppah makes no argument regarding the validity of the search warrant for the stolen vehicle based on Lezard's statements made to law enforcement. "We are not required to construct an argument on behalf of appellants." *State v. Cox*, 109 Wn. App. 937, 943, 38 P.3d 371 (2002). Therefore, we do not address any challenge to the second sentence of conclusion 4 relating to the lawful search of the vehicle pursuant to a search warrant.

iii.     No fruit of the poisonous tree

Suppah argues that the evidence in Suppah's possession when he was arrested should have been excluded as fruit of the poisonous tree because the trap and trace order was invalid. The State argues that no evidence should have been suppressed because law enforcement arrested Suppah on his outstanding warrants and the independent source exception to the exclusionary rule applies. We agree with the State.

"'Washington's exclusionary rule[16] is nearly categorical.'" *State v. Mayfield*, 192 Wn.2d 871, 888, 434 P.3d 58 (2019) (internal quotation marks omitted) (quoting *State v. Afana*, 169 Wn.2d 169, 180, 233 P.3d 879 (2010)). However, Washington's exclusionary rule does not

---

[16] "[T]he exclusionary rule generally requires that evidence obtained from an illegal search and seizure be suppressed." *State v. Betancourth*, 190 Wn.2d 357, 364, 413 P.3d 566 (2018).

operate on a strict "but for" causation basis. *Id*. at 882. "In narrow circumstances, evidence may be admissible even if the evidence likely would not have been discovered but for a prior article I, section 7 violation." *Id*.

Washington courts recognize that the independent source doctrine allows evidence tainted by unlawful government action to be admitted if the evidence "'ultimately is obtained pursuant to a valid warrant or other lawful means independent of the unlawful action.'" *Id*. at 889 (quoting *State v. Gaines*, 154 Wn.2d 711, 718, 116 P.3d 993 (2005)). The independent source doctrine only applies where the evidence was discovered through a source independent of the initial illegality. *Id*. The independent source doctrine is compatible with article I, section 7 because it applies to situations where "the State derives no benefit from the misconduct of its officers." *Id*.

*Mayfield* cited an independent source case, *State v. Rothenberger*,[17] with approval. *Id*. at 889-90. In *Rothenberger*, police pulled over a car in an allegedly unlawful stop. 73 Wn.2d at 597. The defendant was a passenger, and another person was driving without a license. *Id*. During the allegedly unlawful stop, law enforcement verified that the defendant had a driver's license and allowed the car to leave with the defendant driving. *Id*. Shortly after the allegedly unlawful stop, law enforcement learned that the defendant had a felony arrest warrant. *Id*. Other officers stopped the defendant in the car, arrested him, and searched the car. *Id*. at 597-98. Our Supreme Court described the defendant's argument for suppression as "indescribably silly" because the felony arrest warrant was an "independent source" that gave police the right and the duty to pursue and

---

[17] 73 Wn.2d 596, 597, 440 P.2d 184 (1968).

arrest the defendant. *Id*. at 598, 599. Our Supreme Court held that the evidence obtained after the allegedly unlawful stop was not fruit of the poisonous tree. *Id*. at 601.

Here, the focus of the investigation was Lezard and her blue Nokia cell phone. Suppah had outstanding warrants for his arrest that were entirely unrelated to the crime being investigated. While officers planned to arrest Suppah in part because they wanted to ask him about Lezard in connection with Stafford's shooting, they did not believe Suppah was a suspect in Stafford's shooting. Further, the officers had no reason to believe that Suppah was in possession of the blue Nokia that was the target of the challenged trap and trace order. Officers arrested Suppah on his outstanding arrest warrants, and they seized the items on his person pursuant to search incident to the lawful arrest. Therefore, like in *Rothenberger*, the evidence was discovered through a source independent of the State's illegal action. Because the evidence was discovered through an independent source, we hold that the trial court did not err by concluding that there are no fruits of the poisonous tree that needed to be suppressed (third sentence of conclusion 4). Accordingly, the trial court did not err by denying Suppah's motion to suppress.

## STATEMENT OF ADDITIONAL GROUNDS

A. HANDWRITING SAMPLES

1. Jail Cell Search

Suppah claims that the search of his jail cell before obtaining the search warrant violated his Fourth Amendment and article I, section 7 rights. He also asserts that the illegal search violated his right to counsel under the Sixth Amendment because "legal materials containing confidential information protected by attorney-client privilege were inspected and seized during, and as a result

of, the two searches." SAG at 8. Suppah contends that this seized evidence was used against him at trial in the form of known samples for comparison purposes.

Here, there is no evidence in the record that the jail personnel searched or seized Suppah's legal papers. Because this claim relies on evidence outside the record, it is not properly raised in a statement of additional grounds, and we do not address this claim. *See State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

2.      Ineffective Assistance of Counsel

Suppah claims that his trial counsel was ineffective because he failed to move to suppress or dismiss based on the grounds above. Specifically, he contends that "there is a reasonable probability the verdict would have been different had the illegally obtained evidence and [its] fruits been suppressed." SAG at 10.

When an appellant's claim for ineffective assistance of counsel is based on counsel's failure to make a motion to suppress evidence, the appellant must show that the trial court likely would have granted the motion if made. *McFarland,* 127 Wn.2d at 337 n.4; *accord State v. Gerdts,* 136 Wn. App. 720, 727, 150 P.3d 627 (2007).

Here, trial counsel was not deficient for not moving to suppress the handwriting samples because Suppah did not have a privacy interest in his jail cell and the known samples of Suppah's handwriting used at trial were those obtained through a search warrant. *See Hudson v. Palmer*, 468 U.S. 517, 526, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984). Thus, Suppah has not shown that the trial court would have likely granted a motion to suppress on the grounds asserted. Therefore, this claim fails.

B.      HEARING ON THE MOTION TO DISMISS OR ALTERNATIVELY FOR A CONTINUANCE

Suppah claims that the trial court abused its discretion by failing to read and rule on the motion to dismiss before granting the motion to continue the trial.

CrR 3.3(f)(2) states, "On motion of the court or a party, the court may continue the trial date to a specified date when such continuance is required in the administration of justice and the defendant will not be prejudiced in the presentation of his or her defense."

Here, the trial court was handed the motion upon taking the bench, so the judge did not have an opportunity to read the motion. And the trial was set to begin the next day. Even if Suppah did not agree to the continuance,[18] the trial court's decision to continue the trial was not based on untenable grounds or untenable reasons. A continuance was reasonable in the administration of justice to allow the court to properly address Suppah's motion to dismiss. Also, Suppah has not shown how the presentation of his defense was prejudiced by the continuance. Therefore, this claim fails.

C.      MOTION TO DISMISS

1.      Finding of Fact I—Discovery Request

Suppah claims that because trap and trace orders were under seal, there was no way for him to specifically request them in discovery. He contends that the trial court should have found his request for "any" search warrants specific. SAG at 22.

We review findings of fact to determine whether they are supported by "substantial evidence" and, in turn, whether the findings support the conclusions of law and judgment. *State*

---

[18] The order continuing trial from May 16, 2017 states that the motion for continuance was brought by the defendant upon agreement of the parties.

*v. Macon*, 128 Wn.2d 784, 799, 911 P.2d 1004 (1996). Substantial evidence is evidence sufficient to persuade a fair-minded, rational individual that the finding is true. *State v. Levy*, 156 Wn.2d 709, 733, 132 P.3d 1076 (2006).

Here, the trial court found that Suppah's first counsel did not make "any specific formal request for the pen trap and trace documents relating to the cell phones. [Suppah's first counsel's] discovery demand does request all search warrants." CP at 288. The discovery demand made by Suppah's first counsel requested:

> 3.  A copy of all applications, affidavits, declarations and statements in support of search warrants issued in this case.
>
> 4.  A copy of all executed and unexecuted search warrants issued in the investigation of the above referenced case.

CP at 14. The trial court's finding is supported by substantial evidence because Suppah's first counsel's discovery demand did not mention a trap and trace order or anything related to cell phones. Therefore, this challenge fails.

>  2.  Finding of Fact III—Detective Rock Did Not Have Copies of Documents

Suppah claims that the record does not support the trial court's "Finding of Fact III," which states that "Det. Rock[] did not have copies of any of those documents in the case file." CP at 288. Suppah contends that Detective Rock stated in his defense interview that he had copies of the trap and trace warrants in his casebook.

Here, the record does not contain the portion of the interview where Detective Rock allegedly stated that he had copies of the trap and trace orders in his casebook. And the record does not contain a copy of the casebook on which Suppah relies. Additionally, the portions of the record to which Suppah cites do not show that Detective Rock had the trap and trace orders. We

are not obligated to search the record in support of claims made in a defendant's statement of additional grounds for review. RAP 10.10(c). Therefore, we do not address this claim.

3.    Prosecutorial Misconduct

Suppah claims that the State falsely represented to the trial court during the motion to dismiss hearing that Detective Rock would testify that he had no idea there were trap and trace orders, and the trial court relied on these misrepresentations for its finding that the State did not commit misconduct or gross mismanagement.

Here, the prosecutor stated during the hearing on the motion to dismiss that "I can tell you the detectives will testify under oath. My lead detective will testify he had no idea that there were warrants until [Suppah's trial counsel] started looking at them, because they were sealed and they were obtained by someone on a federal task force." VRP (May 16, 2017) at 31. At trial, the detectives testified that they did know about the existence of the trap and trace orders. Detective Larsen testified that he knew that court orders had been obtained to locate the cell phones. Based on this evidence, the State misrepresented that the detectives had no knowledge of the trap and trace court orders when in fact they did. However, the trial court denied the motion to dismiss not because of the lack of mismanagement but because there was no *egregious* mismanagement and Suppah had failed to show prejudice. And, as discussed above, the trial court did not err in its denial of the motion to dismiss. Therefore, this claim fails.

4.    Reporting Professional Misconduct

Suppah claims that this court should report the professional misconduct of the prosecutor per RPC 8.3(a) because of his above fraudulent misrepresentations.

RPC 8.3(a) states, "A lawyer who knows that another lawyer or LLLT has committed a violation of the applicable Rules of Professional Conduct that raises a substantial question as to that lawyer's or LLLT'S honest, trustworthiness or fitness as a lawyer or LLLT in other respects, should inform the appropriate professional authority."

Here, Suppah never raised this issue in the trial court, so there is no error for this trial court to review. *See* RAP 2.5(a). Additionally, RPC 8.3(a) states that a *lawyer* should inform the appropriate authorities as to another lawyer's misconduct, not the *court*. Therefore, we decline Suppah's request to report any professional misconduct.

5.      Phone Inspection

Suppah claims that the trial court abused its discretion by failing to consider and rule on the State's actions in delaying Suppah's ability to inspect the cell phones.

Here, Suppah never raised this issue in the trial court. Although he filed objections to the State's proposed findings of fact and conclusions of law, his objections did not include the trial court's failure to address the State's actions in delaying Suppah's ability to inspect the cell phones. Therefore, we exercise our discretion under RAP 2.5 and do not review this issue.

6.      Burden to Show Prejudice

Suppah claims that the trial court erred by placing the burden to prove prejudice on the defense, rather than placing the burden to show lack of prejudice on the State.

Under CrR 8.3(b), the defendant must show prejudice affecting the defendant's right to a fair trial. *Michielli*, 132 Wn.2d at 240. Here, as required under CrR 8.3(b) and *Michielli*, the trial

49

court stated that the defendant bears the burden of establishing prejudice to the defendant from the State's misconduct. This claim fails.[19]

D.      MOTION TO SUPPRESS

        1.      Lack of Evidentiary Hearing

Suppah claims that the trial court erred by not holding an evidentiary hearing on the disputed facts. We disagree.

CrR 3.6(a) provides, "The court shall determine whether an evidentiary hearing is required based upon the moving papers." The trial court has discretion whether to take oral testimony on a motion to suppress. *State v. McLaughlin,* 74 Wn.2d 301, 303, 444 P.2d 699 (1968).

Here, at the hearing on the findings of fact and conclusions of law, Suppah stated that it agreed with the facts laid out in the proposed order but did not think they were relevant to the argument. The only fact that Suppah disagreed with was, "[T]hat was the first time any of the arresting officers knew Krause was even in the vicinity." VRP (Aug. 13, 2018) at 18.

Suppah has not challenged the only disputed finding on appeal. And Suppah does not present any argument as to relevance of the disputed fact with regard to the trial court's decision. Thus, this claim fails.

Suppah also references "'Objections to State's Proposed Findings of Fact and Conclusions of Law'" for the Motion to Suppress. SAG at 38. He "respectfully request[s] this Court to consider all of the raised objections contained in that document and hereby continue those objections

---

[19] Suppah also claims that that the trial court erred in concluding that there was no prejudice to Suppah from the late disclosure of the trap and trace orders and the late response from the State to the motion to inspect the cell phones. These issues have been discussed above.

through this appeal." SAG at 38. This document is not in the record, so we do not address these issues. *See McFarland*, 127 Wn.2d at 335.

2.      Inconsistent Findings

Suppah claims that the trial court made inconsistent findings in its rulings on the motion to dismiss and the motion to suppress, arguing that the trial court's oral finding that the lead detective was unaware of the trap and trace warrants is inconsistent with the trial court's later written finding that Detective Buchanan notified Detective Rock that Sprint had given him geo-locate information on the Sprint number ending in 9468.

Here, at the hearing for the motion to dismiss, the court stated that "It's kind of a unique circumstances [sic] where the lead detective is unaware that there is a skip trace warrant out there; didn't know about it. Another detective in the same agency did, but he did not." VRP (June 15, 2017) at 25. But the trial court did not include in its written findings of fact that Detective Rock was unaware of the orders. Rather the trial court found in its written order that "[t]he lead detective in this case, Det. Rock, did not have copies of any of those documents in the case file." CP at 288. The trial court's ultimate decision is that Detective Rock did not have the orders, not that he did not know about the orders. The oral ruling is not in conflict with the written opinion. Therefore, this claim fails.[20]

3.      Cell Site Simulator

Suppah claims that none of the required technical details of the cell site simulator were provided in the trap and trace orders. But Suppah does not state what "technical details" are being

---

[20] Suppah also claims that the trap and trace orders were invalid because they lacked geographic limits. This issue has been addressed above.

challenged.  Because Suppah fails to inform us of the "technical details" relating to the cell site simulator he alleges were missing in the trap and trace order, we do not consider this issue.  *See* RAP 10.10(c).

E.    OPENING STATEMENTS

1.    Blue Nokia Phone/Legge Testimony

Suppah claims that the prosecutor acted in bad faith during opening statements by "misrepresenting the blue [Nokia] as the phone that was used to message the victim" while Detective Rock and Lezard's testimony said otherwise and that the prosecutor misrepresented the evidence in opening statements because Legge did not testify that Suppah "'had a beef'" with Stafford.  SAG at 49, 50 (quoting VRP (Aug. 21, 2017) at 24).

The burden of showing bad faith is on the defendant.  *State v. Campbell*, 103 Wn.2d 1, 16, 691 P.2d 929 (1984), *cert. denied*, 471 U.S. 1094 (1985); *see State v. Farnsworth*, 185 Wn.2d 768, 786, 374 P.3d 1152 (2016) (plurality opinion). Here, while the prosecutor did state in his opening statement that a blue Nokia phone was used to message Stafford, and the testimony showed that a black ZTE phone was used, there is no evidence that the prosecutor said this in bad faith or that this statement affected the verdict.  Similarly, there is no evidence that the lack of testimony from Legge affected the verdict.  Therefore, these claims fail.

2.    Credibility

Suppah claims that the court abused its discretion by overruling his objection to the State's improperly vouching for the credibility of its witness.  Suppah points to the prosecuting attorney's statement that Lezard "'must tell the truth'" in the State's opening statement.  SAG at 52 (quoting VRP (Aug. 21, 2017) at 21).

Improper vouching generally occurs if the prosecutor expresses his or her personal belief about the veracity of a witness, or if the prosecutor indicates that evidence not presented at trial supports the witness's testimony. *State v. Thorgerson*, 172 Wn.2d 438, 443, 258 P.3d 43 (2011). Here, during his opening statement, the prosecutor stated that Lezard must tell the truth as a condition of her plea deal. This is not a personal belief as to the credibility of a witness. Thus, the trial court did not abuse its discretion in overruling Suppah's objection.

3.      Ineffective Assistance of Counsel

Suppah claims that his trial counsel was ineffective because he failed to object or move for mistrial for the prejudicial misconduct of the State in its opening statement.

If the defendant bases his ineffective assistance of counsel claim on defense counsel's failure to object, the defendant must show that the objection or motion would have succeeded. *See Gerdts,* 136 Wn. App. at 727. Here, because there is no evidence the prosecutor acted in bad faith or vouched for witness credibility, Suppah's trial counsel was not deficient in not objecting or moving for a new trial based on the prosecutor's opening statements. Thus, this claim fails.

F.      CLOSING ARGUMENT/MOTION FOR A NEW TRIAL/MOTION TO DISMISS FELONY MURDER AS CHARGED

Suppah claims that the trial court erred by allowing the State to mischaracterize Suppah's closing argument, denying Suppah's motion for a new trial, and denying Suppah's motion to dismiss second degree felony murder charge.

Here, Suppah merely states that "the State has made several misrepresentations throughout the trial," but he provides no specifics. SAG at 53. Suppah also alleges that the State misrepresented his closing argument and violated the "motion in limine precluding it from arguing

law contrary to that given by the court" by arguing contrary law after Suppah gave its closing argument. SAG at 53. Beyond these broad allegations, Suppah provides nothing further to inform the court of the nature of the alleged errors. Because Suppah fails to inform us of the nature and occurrence of the alleged errors as required by RAP 10.10(c), we do not review these challenges.

### 1. Distinct Act for Felony Murder

Suppah claims that the trial court erred in denying his motion to dismiss second degree felony murder charge because the felony murder statute was "intended to apply when the underlying felony is distinct from, yet related to the homicide act." SAG at 53.

The legislature amended the felony murder statute in 2003 to add its intent that assault be a predicate offense for felony murder. LAWS OF 2003, ch. 3, § 2; *see* RCW 9A.32.050(b). And this court has previously ruled on this issue, holding that the 2003 legislative amendment made it clear that the legislature intended assault to be a predicate felony. *State v. McDaniel*, 185 Wn. App. 932, 937, 344 P.3d 1241, *review denied*, 183 Wn.2d 1011 (2015).

Here, Suppah was charged with second degree murder based on the felony murder statute, with the predicate offense of second degree assault. Because the legislature and the established case law allow assault as a predicate offense for felony murder, the trial court did not err in denying the motion to dismiss the second degree felony murder charge.

### 2. Sufficient Evidence

Suppah claims that his conduct did not violate the second degree felony murder statute.

We review a challenge to the sufficiency of the evidence de novo. *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). We consider whether any rational trier of fact can find the essential

elements of the crime beyond a reasonable doubt based the evidence viewed in the light most favorable to the prosecution. *Id.*

Based on the record, there was overwhelming evidence that Suppah committed the murder. Lezard testified that Suppah texted Stafford to meet them in Tacoma and then shot Stafford when Stafford leaned inside the car. After Suppah fired the gun, he said, "'That's what you get for owing a motherf****r money.'" 5 VRP (Aug. 23, 2017) at 686. Watts testified that Suppah drew a gun from his breast pocket and fired a shot at a man who leaned into the car that Suppah was driving. Watts testified that Suppah used a semiautomatic Colt gun, which ejects a spent casing. A spent shell casing was found inside the car Suppah had the keys to. Walsh testified that the cartridge was fired from a semiautomatic pistol. Legge testified that Suppah traded in a semiautomatic gun for drugs. Taking the evidence in the light most favorable to the prosecution, any rational trier of fact could have found Suppah guilty of second degree felony murder beyond a reasonable doubt. Therefore, sufficient evidence supports Suppah's conviction for second degree felony murder.

## CONCLUSION

We hold that the trial court did not err in denying Suppah's CrR 8.3 motion to dismiss, the trial court did not err in denying Suppah's motion to suppress, and Suppah's SAG claims do not require reversal. Accordingly, we affirm Suppah's convictions.

No. 51068-5-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Cruser, A.C.J.

Worswick, J.P.T.